The next matter on our calendar is Benihana of Tokyo v. Benihana, Inc. Thank you. Morning. Morning. Good morning, Your Honors. It's Jeremy Shulman on behalf of the appellants Benihana of Tokyo, LLC, and Keiko Aoki, who is the CEO of Benihana of Tokyo. Your Honors, in this case, we contend that the district court erred in awarding attorney's fees and costs to Benihana, Inc., we call BI, under the Lanham Act, 15 U.S.C. Did they prevail? Excuse me? Did they prevail? Our contention, Your Honor, is that either both sides prevailed or neither side prevailed. Anything that you asked for, you began this lawsuit, right? We began the lawsuit. Did you get any of the relief that you asked for in your complaint seeking an injunction? We prevailed on our defenses, Your Honor. But you prevailed on nothing that you affirmatively sought. Is that correct? Correct. We began the case with a declaratory judgment claim, and we withdrew it after four months. The litigation proceeded almost entirely with respect to BI's counterclaims. So you could say there was two phases of the case. And they prevailed on how many of their counterclaims? Well, we don't believe they prevailed at all, Your Honor, in the sense that the parties reached a mutual bilateral settlement agreement. They got a so-ordered injunction, didn't they? So did we. So we have a so-ordered settlement agreement, which for practical reasons. Was there a distinction made between what they got and what you got? There was a distinction without a difference. If you look at the actual document, ours is docket 131. It says settlement agreement. It says Benihana agrees that it will refrain from, and then it lists almost all the same conduct that appears in this injunction that Judge Chin referred. If they don't refrain from those things, can you bring a contempt proceeding against them? Well, the Roberson case says that that's not a critical distinction, whether or not a contempt proceeding can be brought. How about answering my question, which could you bring a contempt proceeding against them if they did not refrain from that conduct? I believe we could, Your Honor, because the settlement agreement is so ordered. So in paragraph 5, it states that this action will be dismissed with prejudice and closed. The court shall retain jurisdiction over any application to enforce the terms of the settlement agreement. And it's not just a private agreement among the parties. Judge Engelmeyer also ordered it. So what's the import of so—we would say that that's immaterial that the judge so ordered it. If we treat this purely as a private settlement agreement, it's more than that because it was embodied in a court order. That's what the Roberson decision— You were telling us that you came out as well with respect to what you were seeking as they did with respect to what they were seeking, or better. Yes, and I'd be happy to explain, Judge LaValle. You'd have to do some pretty fancy explaining. The status quo ante was we have an international brand, a worldwide brand, that is divided into different territories, with Benihana of Tokyo prevailing in certain territories and BI in other territories. Both sides before the lawsuit were touting their worldwide—the worldwide presence of Benihana. So there was parity in what we could say and what they could say. They began sending us letters saying, you cannot tout the worldwide presence of Benihana. We said, we think we can. Your complaint didn't charge them with violating your trademarks by claiming worldwide. Because we thought both parties could do it. So they're doing it. We're doing it. We think it's OK. They say it's not OK. We come to court to get clarification. They then bring counterclaims, which is essentially the mirror image of what we were seeking, and we defend those counterclaims, basically saying, you can't accuse us of violating trademarks if you're doing the exact same—you're engaging in the exact same conduct. So we want parity. Either we both can say these things or neither of us can say these things. And that is exactly the outcome that was obtained. There was perfect parity before the case and perfect parity after the case in what the parties can say. After they brought their counterclaim, did you then add claims, charging them with claiming worldwide? No, we defended—no, we did not. We defended their counterclaims by saying, what's good for the goose is good for the gander. If you're doing it, so can we. And the parties reached a settlement agreement that basically said, OK, we're going to continue with the same reciprocity, the same bilateral approach, and the parties opted for neither side to be able to tout the worldwide presence of the brand. So did you—your documents at some point in court accused them of violating your trademarks outside of their territory? Well, yeah, we had the defense of unclean hands. We said they can't accuse us of violating the trademarks when they're engaged in the exact same conduct. So we had affirmative—we have the defenses of unclean hands, latches for their failure— they're allowing us to do what we were doing and didn't complain about it. And we pressed those defenses aggressively, and ultimately they prevailed in the sense that we got— those defenses resulted in BI dismissing its counterclaims with prejudice. Can you give us a reference to the pleadings, your pleadings, which charged them with violating your trademarks by claiming worldwide beyond their territory? Well, I'm saying it's in their affirmative defenses. Tell me exactly where to look to see it. I did bring—I did not bring our answer up here, Your Honor, but I can quickly—while my adversary is arguing, I can get the citation to the record. We think— The district court credited your client's former lawyer's testimony that the case was brought regardless of merit and the motivation was just to cause the other side to incur lots of attorney's fees, and that's a credibility assessment of the district court, correct? It is reviewed for abuse of discretion, Your Honor. It is a credibility determination. However, it wasn't—we believe that it's an abuse of discretion because if you look just squarely at the testimony, the testimony makes very clear that the lawyer was testifying as to conversations he had with Ms. Aoki in 2013. So he was ascribing to her certain motivations as of 2013, and he was also doing it in the context of her positions under the license agreement, and this license agreement applied to one restaurant in Hawaii. The case that is before Your Honors does not deal with the license agreement because that case went to arbitration and is subject to a separate set of proceedings. This case deals not with the license agreement but with the Lanham Act claims. So Mr.— This case has merit? This case had merit when she brought it even though the early ones did not? Absolutely this had merit. And to consider what happened in other cases really is not germane to the exceptionality test. So the question before the court is in this case under the Lanham Act, was this case exceptional? And the octane fitness standard now applies because of the— The district court was not called upon to decide the Lanham Act claims, but he noted that the documentary exhibits submitted in advance of the bench trial, quote, unavoidably reflected what appeared to be transparent breaches of the Lanham Act by your client. And he thought that is what led to the settlement after the opening statements. That's what the judge concluded, Your Honor, but we think that was erroneous and also immaterial to the ultimate question of whether or not this is an exceptional case. I mean the standard imports elements of good faith, bad faith and the motivations of bringing the case and the conduct during the litigation. There's no conduct that the judge pointed to that he cast aspersions on with respect to the conduct of litigation other than some potential spoliation of e-mails, and he made somewhat passing reference to that piece. And there was no contention with regard to that, that there was any intentional destruction of e-mails. It was rather an inadvertent failure potentially to preserve certain e-mails. But the core of his analysis was not that. It was this testimony of Mr. Feldman, which we just think is completely irrelevant because it was speaking of a different case, different claims, in a different time period. Thank you. We'll hear from what everyone is calling B.I. Thank you, Your Honor. Alan Fine, Veronica Desias on behalf of B.I. Respectfully, I believe your analysis begins where your questions did, which is was B.I. the prevailing party? Did Judge Inglemeyer correctly apply the standard to prevailing party? And that is the threshold question that we begin with. And, indeed, there's a bright-line test, which Judge Inglemeyer recognized in this Court's opinion in Roberson, applying what the Hensley Supreme Court opinion, which is the Hensley Court said the question of prevailing party, there's a generous formulation, and the test is B.I. would be a prevailing party if they succeed on any significant issue in this litigation, which achieves some of the benefit the parties sought in bringing suit. So that's the question that Judge Inglemeyer answered. And, of course, he answered it yes. In fact, not only did B.I. achieve some of the benefits it sought in the litigation, the Court found, Judge Inglemeyer found, we achieved all of the benefits we sought in the litigation. In our third amended counterclaim, which is the operative document, we had a prayer for relief. And in his 31-page opinion, Judge Inglemeyer takes that prayer for relief, compares it to the injunction he enters, and with the exception of the addition of one word that we had asked for, which was unauthorized, it matches perfectly. But you are opposing counsel say they achieved relief too. I heard him say it. He said, well, I wrote down what he said because it was so remarkable. He said that they actually prevailed on our defenses. And he said that, well, they complained in their affirmative defenses that we had unclean hands because B.I. in one or two documents over 20 years used the word worldwide or said that they had a world-famous entertainment at their restaurant, something to that effect. So this issue was raised below, and Judge Inglemeyer said, this doesn't make B.I. any less of a prevailing party because when they raised these affirmative defenses, they lost. They said that as a result of the affirmative defenses, that the court, as a court in equity, should find that B.I. had unclean hands and that therefore we shouldn't get an injunction. And then the court said, B.O.T. invoked B.I.'s action as unclean hands defense to avoid B.I.'s injunction. Such an injunction did issue. B.I. got what it asked for. B.O.T. did not. So, no, they did not prevail. But even if they were— Let me just interrupt you for a second. You said in characterizing the argument that they made or the claim that they made relating to unclean hands— Yes. You said they were claiming that your client was claiming worldwide or world-famous. It seems to me there's a big difference between those two. Was it worldwide or was it world-famous? Because you could say world-famous with respect to a mark that only is exclusive within a limited territory— Yes. —without violating the rights of somebody else who owns that mark elsewhere in the world. In Mr. Manson's opening statement, he listed a number of different things that they claimed B.I. said. Most of them were world-famous. At one point, long before the case went to trial, the website said something about that we had restaurants in America and around the world, something to that effect. We never did anything like what the BOT did here where Ms. Aoki was claiming that she was actually the CEO of our company opening a restaurant in New York City, using our marks in New York City, and claiming that was part of their global presence. I mean, as Judge Engelmeyer went on and on in the discussion of exceptionality, he said that you just couldn't compare what they were saying compared to what they were saying. But ultimately, as he found, it really—Counsel's argument misses the point because that doesn't change anything about the job this Court is supposed to do, which is to apply the Roberson-Hensley test and ask if Judge Engelmeyer got that wrong. Did B.I. succeed on any significant issue in this litigation? Did we achieve some benefit that we sought in bringing the lawsuit? And in going to that, Your Honor, I think it's worth pointing out that, as Judge Engelmeyer pointed out, they never sought an injunction. That's what I was going to ask you. They never asked the Court to enjoin you from doing anything outside your territory. Right. Nor did they argue below, and when we were briefing this attorneys' fees issue, that they were somehow the prevailing party. They asked, wasn't the original lawsuit seeking an injunction? Oh, no, declaratory judgment. Yes. What happened was B.I. had sent them a letter saying, hey, you've got to stop doing what you're doing. And they said, well, you know, we said, please do it within 30 days. And on the 30th day, they filed a lawsuit for declaratory judgment, which was completely consistent with, and Mr. Feldman filed that lawsuit. And Mr. Feldman's testimony, which goes to the exceptionality question, was that, yes, at that very time, Ms. Aoki was telling him, as the judge found, we had the rarest of direct evidence of bad faith, and admission to that effect by the lawyer who brought this lawsuit. And Mr. Feldman testified, it was remarkable, and certainly in my now 40-year career, Mr. Feldman testified that Ms. Aoki told him that the overall strategy was to force B.I. to expand large counsel fees to contest her unreasonable actions in courts, plural, in New York, Delaware, and Hawaii, so that they might entertain discussions to have B.O.T. purchase B.I. And then the court finds, the court who lived with this case for almost five years, as a matter of fact, I know Judge Chin was on an earlier pattern on the original injunction, which led to Mr. Feldman's remarkable testimony on the sanctions hearing. The court says, the conduct of B.O.T. and Aoki in this lawsuit fits to a tee Mr. Feldman's description of her, Ms. Aoki's litigation strategy of pursuing unjustified conduct, claims, and defenses to win a long game of attrition. Based on that, the trial court found that the octane standard was met. He also found that the willfulness standard, pre-octane willfulness standard was met. And he talked about the Fogarty factors, the four factors in Fogarty, where the Supreme Court talked about what you look at in the totality of circumstances to determine whether or not this was an exceptional case. Frivolousness, check. Motivation, check. And he relied on not only Mr. Feldman's testimony, but also on what he had personally observed over the five years of litigation. Objective unreasonableness, and then what he considered to be almost the most important here, deterrence and compensation. On page 21 of his opinion, Judge Inglemeyer says, the need to deter B.O.T. from further excesses is compelling. And indeed, he had already awarded sanctions under the injunction that was the subject matter of the case that we were previously here on before Judge Chin. And then with regard to compensation, again, Ms. Aoki's stated goal was to drive up our attorney's fees. And on that question, it was mission accomplished. Our attorney's fees for fighting over four years on a case, as the court pointed out, didn't settle until at trial, after compelling opening statements, the other side said, uncle, and we got the injunction, the very injunction we were seeking. It was only then, after we did all the work to get there, prepare all the witnesses, prepare hundreds of exhibits, take all the discovery, fight every motion, hand-to-hand combat for four years. Yes, it took a lot of money and a lot of work, and work, frankly, with all due respect, work our firm is extremely proud of and our client should be recompensed for. Thank you, counsel. Mr. Shillman, I think you reserved two minutes. Thank you. Judge LaValle, the docket entry is 108 on the answer that you were asking about earlier, and we asserted firm of defense is of equitable estoppel and unclean hands. I think it's important, Your Honors, to . . . What did it say? Excuse me? What did it say? It asserts those in a fairly generic fashion, but it's asserting that BI cannot pursue claims, Lanham Act claims, for infringing the mark when they themselves are engaged in the exact same conduct. And we elaborated on those defenses throughout the litigation and at trial in the opening statements. We cite an Eighth Circuit case, East Iowa Plastics, and we think that's an important line of cases, Your Honors, because it essentially says that if there is a dead heat, if both sides obtain something, some change in the other side's position with respect to claims, then neither side can be deemed the prevailing party. So that's really the principle that we're invoking here. If both sides prevailed, in a sense, because both sides obtained judicially incorporated, so-ordered relief, in the Settlement Agreement's Docket Entry 131, BI, there's a host of things that BI cannot do. They cannot say they're the world leader or global leader of teppanyaki restaurants. They can't say they have more than 100 locations worldwide. They can't say that they are experiencing worldwide growth and international recognition. They can't say they're operating across the world. There's a host of things that they cannot do. It's an injunction because it says they will refrain from doing this, and then the court orders it. So there's no practical difference between that and the document that's attached, which then enjoins BOT from similar conduct. I see my time has expired. We ask for the vacated. Thank you, Your Honor. We will reserve decision.